EMANUEL E. WRIGHT,                    )
                                      )
         Plaintiff,                   )
                                      )
         v.                           )          Case No. 1:09-cv-1202-TWP-MJD
                                      )
BARTH ELECTRIC CO., INC., and         )
BROOKS-HAYDEN ELECTRIC,               )
                                      )
         Defendants.                  )

## ENTRY ON MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on two separate motions: (1) Defendant Brooks-Hayden

Electric's ("BHEC") Motion for Summary Judgment; and (2) Defendant Barth Electric Co. Inc.'s

("Barth") Motion for Summary Judgment.  This dispute stems from Plaintiff Emanuel Wright's

("Plaintiff" or "Wright") allegations of race discrimination and retaliation in violation of Title

VII and 42 U.S.C. § 1981 ("Section 1981").  Barth and BHEC lambast Wright's allegations as

far-fetched conspiracy theories.  Wright, of course, vehemently disagrees.  After sorting through

the relevant facts, the Court **GRANTS** BHEC's Motion for Summary Judgment (Dkt. 49) and

**DENIES** Barth's Motion for Summary Judgment (Dkt. 52).

## I.  BACKGROUND

The following background section is not necessarily objectively true, but as the summary

judgment standard requires, the undisputed facts and the disputed evidence are presented in the

light reasonably most favorable to Plaintiffs as the non-movants.  *Reeves v. Sanderson Plumbing*

*Products, Inc.*, 530 U.S. 133, 150 (2000).

**A. Barth, Brooks-Hayden, the IBEW, and Wright**

Barth is a family-owned Indianapolis electrical contractor. BHEC is an Indianapolis electrical contractor owned by Natalie Brooks ("Brooks"), an African-American woman, and her husband Manuel Hayden ("Hayden"), an African-American man. Brooks is the president and Hayden is the vice-president. Barth and BHEC are both signatories to the International Brotherhood of Electrical Workers ("IBEW"), Local 481, collective bargaining agreement ("Inside Agreement"). Local 481's region consists of sixteen Indiana counties, including Marion and Madison. The IBEW requires its members to sign an "out-of-work" list if they are looking for work. Under the Inside Agreement, the IBEW's referral system is the only way for an electrician to obtain a job with a contractor within certain geographic regions of Indiana. Specifically, under the referral system, when a signatory contractor needs electricians, it contacts the IBEW, which then refers the next electrician on the list, subject to the contractor's and the electrician's right to refuse the referral. The Inside Agreement provides that an employer signatory may terminate an employee who refuses work within Local 481's region. Finally, the IBEW requires employers to have a foreman on all jobs where they employ ten or more employees.

Wright, an African-American man, is a certified journeyman electrician, completing his apprenticeship in 2002. Wright is a member of the IBEW. In the summer of 2006, Wright, unemployed at the time, called Hayden and asked if he had a foreman job available. Hayden did not, but he met with Wright and they discussed Wright's qualifications and work history.

## B.     Wright begins working for BHEC

In December 2006, BHEC notified the IBEW that it was in need of some journeymen electricians.  Wright, still unemployed, was high enough on the "out-of-work" list to bid on BHEC's work.  BHEC accepted Wright's bid.  On December 6, 2006, Wright began working for BHEC as an electrician on an Indianapolis Water Company project.  The next day, BHEC moved Wright to an Indianapolis Airport project.

## C.     The Lucas Oil Stadium project

Soon thereafter, Barth selected BHEC as a certified minority and woman-owned electrical subcontractor on the Lucas Oil Stadium ("LOS") project.  In January 2007, BHEC began working on the LOS project.  BHEC's involvement in the project was limited to providing labor to Barth on an as-needed basis.  Therefore, BHEC had no role in the day-to-day direction of work.  Further, BHEC did not assign crew placements.  Rather, BHEC employees were placed on Barth crews, reported to Barth foremen, and received most major tools and materials from Barth.  Crews varied in size, depending on the nature and scope of their work.  One of Barth's two general foreman, Paul Hammond ("Hammond"), a Caucasian, was responsible for distributing duties, coordinating manpower, and supervising foremen for the LOS project.  Hammond reported to Van Bragg ("Bragg"), a Caucasian and Barth's project manager.

Hayden selected Wright as the first BHEC journeyman electrician to work on the LOS project.  Wright began working on the project in January 2007 and additional BHEC journeymen were sent to the project as it progressed.  At the height of BHEC's involvement in the LOS project, it had roughly ten electricians on the site.  By contrast, Barth had anywhere from 120 to 170.  Approximately 10% of Barth's electricians were African-American.

**D.      Wright begins working at LOS**

From his start date until May 2007, Wright worked on a pre-existing crew that performed electrical distribution work.  By May 2007, BHEC had a total of ten employees working on the LOS project.  All of the BHEC employees were Caucasian, except for Wright.  Pursuant to the Inside Agreement, once an employer had ten employees on a project, it had to employ a foreman.  Initially, the IBEW took the position that the Inside Agreement required BHEC to segregate all of its electricians into one crew and to elevate one member as foreman.  Barth expressed concerns that it would be inefficient and disruptive to create a new crew out of whole cloth.  Ultimately, BHEC agreed to appoint one of its LOS electricians to a foreman position.

**E.      Wright is elevated to foreman**

BHEC, specifically Hayden, offered Wright the job.  In doing so, Hayden stated that Wright would become foreman of the temporary lighting crew, which is responsible for setting up temporary lighting so that the other workers can see what they are doing.  Initially, Wright was reluctant to work on temporary lighting because it was *not a very good job as far as a foreman goes* and *anyone could probably do that job.*  Nonetheless, after mulling it over, Wright accepted the position.  With his new foreman title, Wright received a 12% pay raise from his journeyman's wages.  Hayden allegedly instructed Wright to be careful because he would be watched and to contact him with any problems.  Hayden also informed Wright that, as a foreman, he would receive work assignments from Hammond.  Hayden consulted Bragg on his decision to elevate Wright.  Hammond and Bragg both agreed that since Wright was the first BHEC journeyman at LOS, it was logical to give him the foreman opportunity.

At the time of Wright's promotion, there were no existing crews in need of a foreman. On Wright's first day as foreman, Hammond told Wright that he would lead the temporary lighting crew after Dan Carr ("Carr"), the current crew foreman, left the job. Carr, who presided over a crew of two apprentices and two journeymen, was set to be transferred in roughly one month. Until then, Wright was to work on Carr's crew and familiarize himself with installing and removing temporary lighting. According to Wright, he did not have supervisory responsibilities and functioned more as a member of Carr's crew than as a foreman. Wright did, however, testify that other foremen, who knew that Wright would be taking Carr's position, approached him directly for temporary lighting. Moreover, Wright testified that he took the initiative to assess jobs on his own. About once a month, Wright attended foremen meetings. When Carr did not leave as planned, Wright called Hayden to complain. Hayden, in turn, assured Wright that he would relay his concerns to Hammond. Wright does not know if Hayden ever did so.

After roughly a month, Hammond assigned Leroy Thomas ("Thomas"), an African-American Barth journeyman electrician, to work with Wright. Apparently, Wright and Thomas worked separate and apart from Carr's crew. On this point, Wright testified, *"[Thomas] and I worked together, and Carr and the other guys worked together."* Wright claims that he was not actually Thomas' supervisor, even though he was a foreman and Thomas was a journeyman.

Eventually, Carr left. Around this time, Hammond approached Wright and Thomas and tasked them with new duties relating to changing out transformer and heating units in LOS' suites. According to Hammond, this job did not require a large crew but it did require someone *"with some savvy"* and a *"variety of knowledge."* When Wright inquired about the temporary

lighting job, Hammond responded that *"[t]he apprentices can take care of temporary lighting."* Ultimately, Hammond assigned Bryan Haas ("Haas"), a Caucasian Barth employee who had just completed his apprenticeship, to take the helm on the temporary lighting crew. When asked why he opted for Haas over Wright, Hammond stated that the temporary lighting job would have been *"a waste of [Wright's] talents"* because the job *"didn't require the experience that [Wright] had."*[1]

Around July 2007, Wright approached Hammond and informed him that he and Thomas had almost completed the transformer-related work. Wright and Thomas were then assigned new duties relating to installing transformer disconnection switches on blowers, exhaust fans, and other equipment. These new duties lasted two to three months, and were punctuated by stretches where Wright and Thomas had long lulls in work. During these slow periods, Wright "tried to stay out of sight" so that he would not be subjected to *"ridicule from other workers because. . . [they perceived that] we weren't being productive."* Wright expressed frustration to Hayden, who encouraged Wright to be patient and assured him that he would eventually lead a crew.

After the switch installation project concluded, Wright completed a hodgepodge of other assignments. Ultimately, Hammond assigned Murth Ramsey ("Ramsey"), an African-American Barth trainee electrician, to work under Wright's supervision for a project involving the installation of ground risers into telecom rooms. This arrangement lasted approximately one month.

---

[1]Wright also emphasizes that Hammond promoted two Caucasian Barth employees to foremen positions – Scott Gindley ("Gindley") and Brent Day ("Day"). Both Gindley and Day led crews. When asked about this, Hammond responded that he did not consider Wright for either job because Wright was under "a different contract." According to Hammond, "[w]e had two contracts, one was power distribution, the other was lighting branch circuits." Wright was on the power distribution contract, whereas Gindley and Day were on the lighting branch circuit contract.

**F.      Wright's new offer and his subsequent complaint**

In September or October 2007, Hayden offered Wright a new opportunity to serve as foreman on a different BHEC project – the Hoosier Park project. This position would allow Wright to lead a full crew. Wright, however, declined; primarily because Anderson was too far away and he feared that he would fall asleep during the drive. Wright also believed that there was plenty of work available in Indianapolis. Anderson is in Madison County, which is within the jurisdiction of the Inside Agreement.

In December 2007, during a telephone conversation, Wright complained to Hayden about Hammond's penchant for assigning Wright African-American employees. In relevant part, Wright testified that he asked Hayden, *"Why [does Barth] keep assigning African Americans to work with me?"* Wright does not recall Hayden's response. This was Wright's only conversation with Hayden about the racial makeup of his co-workers.

**G.      The Incident**

On Friday, January 25, 2008, Wright was picking up employee time sheets on the LOS worksite. Wright picked up a time sheet from Gerald Hopkins ("Hopkins"), an African-American Barth employee. While waiting to pick up another employee's time sheet, Wright and Hopkins began conversing. Lori Griffith ("Griffith"), a Caucasian Barth foreman and Hopkins' supervisor, thought they were loafing. Griffith approached Wright, asking in a sarcastic tone if she should tell Hopkins *"to stop talking to [Wright] so [Wright could] go back and get something done."*

This is where the Griffith and Wright's versions of the event meaningfully diverge. According to Wright, he explained that he was waiting to collect another employee's time sheet. Griffith responded that she wished she had Wright's job; Wright replied that he would call Hayden because he might have a job for her. The conversation then ended. Obviously, Wright's version of the event is accepted as true for purposes of summary judgment.

However, because it ultimately relates to the basis of Wright's termination, Griffith's version of the event warrants discussion. Specifically, Griffith claims that after she asked Wright to leave Hopkins alone, Wright responded *"You don't need to worry about what the f— I'm doing! It's none of your business!"* Griffith responded that Wright was distracting Hopkins, who did work for her. At this point, according to Griffith, she began to tune out Wright's conversation. She did, however, hear Wright state to Hopkins, *"[s]he doesn't understand, we have all the power."* At her deposition, Griffith explained her interpretation of that comment: *"considering the job had to have a certain amount of minority and he was a black male and so was [Hopkins], I think that is what he was [implying], that he had the power because he was a black male."*

Immediately after the incident, Griffith prepared a written description of her version of the event and discussed the event with Jason Koehler ("Koehler"), a Barth employee. From there, Koehler went to the Barth office on the LOS site and reported Griffith's version of the event to Hammond and Bragg, a Caucasian and the LOS Barth Project Manager. Bragg immediately called Hayden to tell him about the verbal skirmish. According to Hayden, Bragg stated that Wright told Griffith that there was *"a new nigger in town."* Notably, however, Griffith never claimed that Wright used racial epithets during their conversation.

At the time of the incident, BHEC's only other project with openings suitable for Wright was the Hoosier Park project – the project that Wright had turned down months earlier. Because Hayden *"had no [other] place to move him,"* he decided to issue a layoff.

## H.    The layoff

On Monday, January 28, 2008, the first work day after the incident, Hayden called Pat Daugherty ("Daugherty"), a BHEC foreman, and asked him to present Wright with a layoff notice. Before doing so, Hayden did not speak with Wright about the allegations. Hayden told Daugherty to classify Wright's termination as a layoff so that Wright could collect unemployment benefits. Hayden further testified that, generally, when employees are presented with layoff slips, the "reasons for termination" section is left blank. When Daugherty gave Wright his walking papers, Wright insisted on an explanation. Daugherty complied, writing *"complaints on jobsite, does not want to travel to other jobsite."*

After being laid off, Wright signed the IBEW "out-of-work" list to be eligible for placement in another job. On September 3, 2008, BHEC hired several journeymen electricians for a job at the Indianapolis airport. Hayden testified that Rick Boothman, a union representative, told Hayden that Wright was high enough on the referral list to bid for the job.[2] Wright, however, never submitted a bid. Hayden testified that he would have hired Wright if he had applied for the position.

---

[2]Plaintiff argues that Boothman's statement is inadmissible hearsay. The Court disagrees. Boothman's statement is not admissible for the truth of the matter asserted. Rather, it is admissible under Fed. R. Evid. 803(3). *See United States v. Hanson*, 994 F.2d 403, 406 (7th Cir. 1993) ("An out of court statement that is offered to show its effect on the hearer's state of mind is not hearsay.") (citations omitted). Regardless, this point is academic. Neither motion turns on the admissibility of this statement.

## I.      Barth's policies

According to Barth's Equal Employment Policy Statement ("EEO Statement"), Barth is committed to the achievement of equal opportunity in employment on all of its jobsites, irrespective of race, color, religion, sex, national origin, age, disability, veteran status, or any other non-job related characteristic.  Barth posted its EEO Statement on its lockboxes at the LOS jobsite.  Wright had a key to Barth's lockboxes and accessed them daily.  Barth's EEO policies were also specifically discussed at a meeting that Wright admits attending.  Barth's EEO Statement contains a reporting mechanism for employees who believe they have either witnessed or been subjected to discrimination.  Workers who believe they have experienced discrimination are encouraged to immediately notify either Doug Arthur (Field Superintendent), Teresa Fahrbach (EEO Officer), or Mike Barth III, the President of the Company.  The EEO Statement provides all three individuals' telephone numbers, as well as Ms. Fahrbach's e-mail address.

Wright never complained to anyone at Barth about observing or being subjected to race discrimination.  He did not object to or refuse any of the assignments Hammond gave him or state to anyone from Barth that he thought Barth's work assignment decisions were based on his race.  Finally, Wright did not object to or protest the assignment of Thomas or Ramsey to assist him.  Additional facts are added below as needed.

## II.  **LEGAL STANDARD**

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d

487, 489-90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). Finally, "neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

### III. DISCUSSION

As an initial matter, Wright is pursuing retaliation and race discrimination claims under both Title VII and Section 1981. These claims, although brought under different statutes, are functionally identical. Therefore, the same analysis will govern. *See Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). Moreover, while Barth and BHEC's motions share many overlapping facts, they turn on considerably different legal issues. Therefore, each motion is analyzed separately.

### A.     BHEC's Motion for Summary Judgment

Initially, Wright brought three claims against BHEC: (1) Title VII race discrimination, (2) Title VII retaliation, and (3) Section 1981 retaliation.  Conceding that he was facing an uphill battle on the race discrimination claim, Wright dismissed it in his response brief.  (Dkt. 59 at 1, n. 1).  Accordingly, only Wright's Title VII and Section 1981 retaliation claims remain.

### 1.     Proving retaliation under the direct method

Title VII forbids retaliation against an employee because that employee "has opposed any practice made an unlawful employment practice" by Title VII or "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a).  Similarly, Section 1981 prohibits racial discrimination in making and enforcing contracts, in part by prohibiting retaliation. *See CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 445-46 (2008).  A plaintiff may prove retaliation under the direct or indirect method. *Metzger v. Illinois State Police*, 519 F.3d 677, 681 (7th Cir. 2008) (citation omitted).  Wright proceeds under the direct method.

Under the direct method, the plaintiff must present evidence, direct or circumstantial, demonstrating that: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action taken by his employer; and (3) a causal connection exists between the two. *Id*.  The heart of this dispute lies with causality, which the parties hotly contest.

Wright concedes that he does not have "smoking gun" direct evidence that would establish causality.  "Evidence of retaliation is 'direct' when, if believed, it would prove the fact in question without reliance on inference or presumption." *Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005) (citation omitted).  Such evidence is rare, given that it "essentially requires an

admission by the decision-maker that his actions were based upon the prohibited animus." *Rogers v. City of* Chicago, 320 F.3d 748, 753 (7th Cir. 2003) (citation and internal quotations omitted). After all, even the most heedless employer is unlikely to make such overt and damning admissions.

If the plaintiff does not have direct evidence, he may still succeed under the direct method if he can muster circumstantial evidence showing the requisite causal link between his complaint and his subsequent adverse employment action. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008); *see also Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994) (in the absence of direct evidence, circumstantial evidence must compose "a convincing mosaic of discrimination against the plaintiff."). Circumstantial evidence "allows a jury to infer intentional discrimination or retaliation." *Volovsek v. Wis. Dep't of Agric.*, 344 F.3d 680, 689 (7th Cir. 2003) (citation omitted). Generally, circumstantial evidence in retaliation cases comes in three varieties: (1) suspicious timing, ambiguous statements, or behavior toward other employees; (2) evidence that similarly situated employees were treated more favorably; or (3) evidence that the employee did not deserve the adverse employment action and that the employer's reason for the action is a pretext for retaliation. *Id.* at 689-90 (citation omitted). Wright relies on all three categories in his attempt to establish that BHEC fired him because of his protected complaint of race discrimination.

### 2. Wright's Evidence

Wright attempts to construct a convincing mosaic of circumstantial evidence from multiple sources. First, Wright emphasizes the timing of his termination. Specifically, he complained about the racial makeup of his co-workers in December 2007 and he was fired

shortly thereafter, on January 28, 2008. Second, Wright argues that BHEC treated a similarly situated employee more favorably, even though that employee engaged in virtually identical conduct. Specifically, Paul Blechl, a Caucasian, used the same racial slur that Wright allegedly used, but was not terminated. Wright posits that the *"only significant difference between Wright and Blechl was the fact that Wright had complained about race discrimination and Blechl had not."* (Dkt. 59 at 26).

Lastly, Wright claims that pretext evidence can establish a causal connection between his complaint and termination. To that end, Wright notes that one of the alleged reasons for his dismissal – that he was not willing to travel to the Anderson job site – is specious, given that the offer was made in fall 2007 and he was not terminated until the end of January 2008. Wright argues, *"Hayden did not terminate him at the very instance he declined the offer, thereby creating the inference that Hayden did not fire him for this reason in January 2008."* (Dkt. 59 at 27). Wright also highlights BHEC's alleged inconsistent reasons for his termination. *See Applebaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003) ("One can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision.") (citations omitted). Initially, BHEC claimed that Wright was fired for job site complaints and refusing the transfer to Hoosier Park. Subsequently, Wright filed a grievance with the IBEW and Hayden submitted a letter to the IBEW Trial Board *"wherein he changed the reason for termination to a reduction in force."* [Dkt. 59 at 29]. Wright argues that these stated reasons are irreconcilable. Moreover, the reduction in force rationale rings particularly hollow, given that the Hoosier Park project was in need of "manpower" at the time of Wright's termination. According to Wright, these three categories of

evidence, viewed in their totality, create genuine issues of material fact regarding causality that preclude summary judgment.

Wright's arguments are well-crafted, but the Court respectfully disagrees. First, Wright's temporal proximity argument is not persuasive. Stripped of its context, perhaps the one to two month lag between Wright's inquiry and his discharge would be forceful evidence of retaliation. After all, the less time that passes between the protected activity and the adverse action, the more likely that a causal connection exists, and one to two months is not a terribly long lag. *Compare to Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 398-99 (7th Cir. 1999) (four months negated causal inference); *Davidson v. Midelfort Clinic*, 133 F.3d 499, 511 (7th Cir. 1998) (no causal inference where employee was terminated five months after filing EEOC complaint).

However, "timing alone is insufficient to establish a genuine issue of material fact to support a retaliation claim." *Brown v. Ill. Dep't of Natural Res.*, 499 F.3d 675, 685 (7th Cir. 2007). More importantly, Wright's argument ignores that there was a significant intervening event between the inquiry and the discharge: namely, the verbal skirmish between Wright and Griffith. After this incident, Hayden was informed that Wright told Griffith that there was *"a new nigger in town."* Hayden then discharged Wright almost immediately. When viewed in its proper context, the strength of Wright's timing evidence dissipates. *See Argyropoulos*, 539 F.3d at 734 ("inappropriate workplace activities are not legitimized by an earlier-filed complaint of discrimination…" and "[t]he approximate seven-week interval between [plaintiff's] sexual harassment complaint and her subsequent [adverse employment action] does not represent that rare case where suspicious timing, without more, will carry the day."). At bottom, Wright's timing evidence does not materially strengthen his case.

Next, Paul Blechl and Wright are not useful comparators because they are not similar in all *material* respects. *See Rogers*, 320 F.3d at 755. Specifically, BHEC fielded complaints from Barth about Wright. Conversely, there is no evidence that a customer called BHEC to complain about Blechl. *See Everroad v. Scott Truck Systems, Inc.*, 604 F.3d 471, 479 (7th Cir. 2010) ("When a plaintiff claims to have been disciplined more harshly than other, similarly situated employees based on a prohibited reason, the plaintiff typically must demonstrate that the other employees engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.") (citation and internal quotations omitted). In fact, Hayden testified that none of his other customers had ever previously complained about one of BHEC's employees making inappropriate statements.

Finally, Wright's purported pretext evidence does not create a genuine issue of material fact. Pretext evidence tends to prove that the employer's reasons are factually baseless, were not the actual motivation for the adverse employment decision in question, or were insufficient to motivate the adverse employment decision. *Balderston v. Fairbanks Morse Engine Div. of Coltec Industries*, 328 F.3d 309, 323. (7th Cir. 2003) (citation omitted). It is worth noting that for purposes of pretext, the paramount issue is what Hayden *honestly believed* when he discharged Wright – not whether Hayden made a bad decision. *See Rand v. CF Indus.*, 42 F.3d 1139, 1146 (7th Cir. 1994); *Crim v. Board of Educ. of Cairo Sch. Dist. No. 1*, 147 F.3d 535, 541 (7th Cir. 1998) ("Even if the [defendant's] reasons…were mistaken, ill-considered or foolish, if the [defendant] honestly believed in those reasons then pretext has not been proven.").

Wright argues that because he was not fired *"at the very instance"* he refused to travel to Hoosier Park, he was not discharged for the reasons set forth in his layoff slip. This argument is

misguided. The evidence shows that he was removed from the LOS project and he was not given the Hoosier Park position because he had already declined it. Stated differently, Wright had already refused the job once, so he was not offered it again. Similarly, Wright's shifting reasons rationale does not create a genuine issue of material fact. Hayden sought to treat Wright's discharge as a layoff to preserve Wright's standing in the Union and his ability to pursue unemployment benefits. This is why the slip was originally left blank, until Wright asked Daugherty for an explanation and Daugherty, on his own, complied. Overall, the "shifting" explanations are more semantic than substantive. *See Rand*, 42 F.3d at 1146 (summary judgment is proper if the proffered explanations are consistent "in substance if not word choice"); *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 577 (7th Cir. 2003) (shifting explanations *can* provide a basis for finding pretext, but "the explanations must actually be shifting and inconsistent to permit an inference of mendacity."). Common sense suggests that a complaint from a customer and a refusal to go to another job site, not retaliatory animus, triggered Wright's discharge. The Court concludes that Wright's mosaic of evidence comes up a few tiles short for purposes of showing retaliation under the direct method.

**B.      Barth's Motion for Summary Judgment**

In its bid for summary judgment, Barth forges a three-pronged attack. First, Barth argues that it was not Wright's "employer" for purposes of Title VII. Second, Barth contends that assuming *arguendo* it was Wright's employer, it still did not subject Wright to a materially adverse employment action. Finally, Barth maintains that Wright cannot possibly offer evidence sufficient to raise an inference of discrimination. Each argument is addressed in turn below.

### 1. For purposes of Title VII, was Barth Wright's "Employer"?

Only an employee's "employer" may be held liable under Title VII. *Robinson v. Sappington*, 351 F.3d 317, 332 n.9 (7th Cir. 2003) (citation omitted). However, for purposes of Title VII, the employee-employer relationship is not always cut-and-dried. Accordingly, an entity that is not the plaintiff's "employer" in the most conventional sense of the word may not automatically escape liability. On this point, courts have recognized that "[t]he term 'employer' has been construed liberally under Title VII, and does not require a direct employer/employee relationship." *Laurin v. Pokoik*, No. 02-Civ-1938, 2004 WL 513999, at *4 (S.D.N.Y. Mar. 15, 2004) (citations omitted). Acknowledging this liberal construction, the Seventh Circuit has stated, *"[w]hen facing questions regarding the employee-employer relationship under Title VII…we look to the economic realities of the relationship and the degree of control the employer exercises."* *Heinemeier v. Chemetco, Inc.*, 246 F.3d 1078, 1082 (7th Cir. 2001) (citations and internal quotations omitted). To administer this "economic realities" test, a court balances five factors:

> (1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations.

*Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378-79 (7th Cir. 1991). Significantly, *"the employer's right to control is the most important [factor] when determining whether an individual is an employee…"*. *Id*. at 378. (emphasis added).

Here, Barth's control over Wright – the "most important" factor – weighs decisively in Wright's favor. Wright received his assignments, materials, and most of his tools directly from Barth. Moreover, Barth set the work schedule, dictated overtime, and scheduled meetings that Wright was required to attend. Without a doubt, Barth exerted considerable control over Wright. The remaining factors cut in both directions; however, they are not game-changers and therefore need not be discussed in detail. In other words, under the instant circumstances, the Court's analysis effectively begins and ends with the first factor: "[g]*enerally, where an employer has the right to control the means and manner of an individual's performance, and to direct the work of that individual, an employer-employee relationship is likely to exist." Caston v. Methodist Med. Ctr. of Ill.*, 215 F. Supp. 2d 1002, 1007 (C.D. Ill. 2002) (felon sufficiently alleged an employer-employee relationship to bring his Title VII claim because defendant had sufficient control over work hours, work place, assignments, and was in a position to interfere with felon's employment opportunities with contractor); *see also Piano v. Ameritech/SBC*, No. 02-C-3237, 2003 WL 260337, at *5 (N.D. Ill. Feb. 5, 2003) (joint employer theory should apply in cases where an individual is employed by a temporary employment agency but suffers discrimination by employer to which he or she is assigned, if the employer exerts a significant amount of control over the individual). Simply stated, there are sufficient facts from which a jury could conclude that Barth and Wright stood in an employment relationship, as that term is construed under Title VII.

**2.     Did Wright suffer a material adverse employment action at the hands of Barth?**

A viable Title VII action necessarily requires a material adverse employment action. The Seventh Circuit has recognized three categories of material adverse employment actions:

> (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing [him] from using [his] skills and experience, so that the skills are likely to atrophy and [his] career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of [his] present job altered, but the conditions in which [he] works are changed in a way that subjects [him] to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in [his] workplace environment.

*Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1116 (7th Cir. 2009) (citation omitted). Of course, not all unpleasant actions are materially adverse. *See, e.g., Grube v. Lau Industries, Inc.*, 257 F.3d 723, 729 (7th Cir. 2001) (unfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, are not materially adverse); *Krause v. City of La Crosse*, 246 F.3d 995, 1000-01 (7th Cir. 2003) (moving from the front office to the back room was not materially adverse); *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 654 (7th Cir. 2000) (denial of bonus is not materially adverse). As the *Hunt* court recognized, *"The idea behind requiring proof of an adverse employment action is simply that a statute which forbids employment discrimination is not intended to reach every bigoted act or gesture that a worker might encounter in the workplace." Id.* at 653 (collecting cases).

Wright makes two arguments in his attempt to stave off summary judgment. First, Wright argues that his removal from the LOS project was motivated by race. Second, Wright claims he was subjected to unfair working conditions compared to other non-black foremen on the LOS project. The Court is particularly persuaded that Wright's first reason creates genuine issues of material fact.

Wright alleges that Bragg – Barth's project manager – called BHEC's vice-president to describe a verbal altercation. In doing so, he embellished the incident, spuriously claiming that

Wright used racially-charged pejoratives. By virtue of the control Barth exerted as a joint employer, a reasonable jury could infer that Bragg was, in effect, directing with discriminatory animus that Wright be disciplined or removed from the project, even though he did not expressly make this request. Tellingly, on the very next workday, Wright was laid off. Drawing all reasonable inferences in favor of Wright, racial motivations entered the causal chain when Barth called BHEC. Because this phone call arguably formed the basis for Wright's ultimate discharge, the causal link between discharge and prejudice was never severed. In other words, drawing all reasonable inferences in Wright's favor, Barth indelibly tainted Wright's discharge.

The Seventh Circuit has described a similar set of circumstances as the "cat's paw rule" – that is, "The decision of an independent decision-maker will not shield the employer from liability if the decision-maker was tainted or influenced by the employer's illegal motives such that the decision-maker acted as the conduit of the employer's prejudice." *Hill v. Potter*, 625 F.3d 998, 1001-02 (7th Cir. 2010) (citation and internal quotations omitted). Although the cat's paw rule is not precisely on-point, it is somewhat instructive.[3] Here, Barth's allegedly false allegations tainted or, at the very least, influenced the decision to lay off Wright. Barth cannot automatically escape liability just because another entity, BHEC, happened to hand Wright his walking papers.

Barth counters that BHEC did not rely on Bragg's call when it made the decision to discharge Wright. To bolster this claim, Barth points to a portion of Hayden's deposition

---

[3] Normally, the "cat's paw rule" applies where a plaintiff seeks to hold "his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Staub v. Proctor Hosp.*, ___ S.Ct.___, 2011 WL 691244, at *3 (March 1, 2011) (citation omitted).

Moreover, the Court believes that a cat's paw theory would fail against BHEC. Notably, Wright is only pursuing a *retaliation* claim, not a race discrimination claim, against BHEC. Even if the Court imputed Barth's racial motivations to BHEC, this would not translate into a viable retaliation claim. After all, there is no evidence suggesting that Barth even knew that Wright voiced a statutorily-protected complaint to Hayden.

testimony, in which he stated that Wright's alleged statements had no effect on his decision. This statement appears to be somewhat of an aberration, however. The fact is, Bragg reported the incident to Hayden, Hayden responded that he would *"deal with it,"* and then issued Wright's layoff the subsequent workday. These telling facts cannot be ignored, Hayden's curious statement notwithstanding. As Barth recognizes in its own reply brief, *"The sole source of Hayden's knowledge regarding what Wright said to Griffith was Bragg."* (Dkt. 69 at 10). At bottom, the Court finds that whether or not Barth subjected Wright to an adverse employment action is a triable issue of fact.

### 3. Does Wright's evidence raise the inference of race-based discrimination?

In order to prevail on a race discrimination claim, a plaintiff must present evidence either directly showing an employer's discriminatory intent or by using the indirect method governed by the *McDonnell Douglas* burden-shifting formula. *Paz v. Wauconda Healthcare & Rehabilitation Centre*, 464 F.3d 659, 665 (7th Cir. 2006). Wright argues that he can avert summary judgment using the direct method. Wright concedes that he does not have direct evidence of discriminatory intent and instead relies on circumstantial evidence.

To reiterate, the Seventh Circuit has repeatedly stated that in the absence of direct evidence, a plaintiff can make his case by constructing a "convincing mosaic of discrimination against plaintiff." *Troupe*, 20 F.3d at 737. Circumstantial evidence "allows a jury to infer intentional discrimination or retaliation." *Volovsek*, 344 F.3d 680, 689 (7th Cir. 2003) (citation omitted). Generally, circumstantial evidence in retaliation cases comes in three varieties: (1) suspicious timing, ambiguous statements, or behavior toward other employees; (2) evidence that similarly situated employees were treated more favorably; or (3) evidence that the employee did

not deserve the adverse employment action and that the employer's reason for the action is a pretext for retaliation. *Id.* at 689-90 (citation omitted).

Wright attempts to construct a convincing mosaic of circumstantial evidence using an assortment of tiles. First, Wright emphasizes that he was the *only* foreman without a crew for an extended period of time. Indeed, with the exception of the one month where he supervised Ramsey, Wright did not supervise a crew from May 2007 to January 2008. With one small exception,[4] all other non-black foremen were given crews to supervise. Second, Wright highlights that he was passed over for the temporary lighting position (which he was promised), even though he was *more* qualified than Haas. Third, Wright casts doubt on the veracity of Hammond's explanation for giving Haas the temporary lighting job. Hammond claims that Wright's talent and experience would have been underutilized in that position. However, this rationale is curious, given that the previous temporary lighting foreman, Carr, was an experienced journeyman. Equally curious, after being passed over for the temporary lighting position, Wright's talents and experience were surely wasted when he intermittently endured long stretches with no assigned work to do.

Fourth, Wright trumpets that Hammond only assigned other African-Americans – Thomas and Ramsey – to work with Wright. Fifth, Wright emphasizes that Bragg's call to Hayden, which precipitated Wright's discharge, was allegedly replete with false information. Specifically, Bragg reported to Hayden that Wright had used racial epithets. Indeed, it is befuddling why Bragg said this, given that Griffith made no mention of such inflammatory terms. According to Wright, "[t]his evidence establishes that Bragg's report to Hayden was

---

[4]Carr apparently worked by himself for less than one month at the very start of the LOS project.

false, and that he knew it to be false." (Dkt. 61 at 33). From there, Wright infers that Bragg's false report was intended to remove Wright from the project.

Barth, of course, strongly disagrees with Wright's characterization of the evidence. First, Barth emphasizes that it considered Wright to be highly skilled. According to Barth, the temporary lighting job would have squandered Wright's skill, savvy, and mechanical acumen. Further, to the extent Wright was treated differently as a foreman, Barth argues, this difference is attributable to the fact that he worked for BHEC. Stated differently, Wright was not "similarly situated" to the Barth foremen. Next, Barth emphasizes that Wright's purported smaller crew is meaningless, because crew sizes naturally varied, depending on the scope and nature of the work. Wright just happened to be assigned to projects that did not demand large crews. Moreover, Barth argues that the race of Wright's co-workers – Thomas and Ramsey – is of absolutely no import, and only invites the Court to engage in speculation and conjecture. Finally, Barth argues that Bragg's alleged report had no influence on Hayden's ultimate decision.

Both sides present well-reasoned arguments. But at the summary judgment stage, where the evidence must be construed in the non-movant's favor, Wright has at a minimum established a material question of fact. Wright was promised the temporary lighting job, was qualified for it, never received it, and spent most of his time working as a foreman without a crew. Moreover, the explanation for why Wright did not receive the temporary lighting job is curious. In effect, Barth argued that he was too qualified, even though the prior temporary lighting foreman had similar credentials. Moreover, the notion that Wright's talents were better utilized elsewhere is somewhat belied by the fact that Wright endured long lulls in his workload. Finally, it is altogether unclear why Bragg told Hayden that Wright had used racial epithets. It would be

reasonable for a jury to conclude that Bragg's allegedly embellished report to Hayden significantly influenced or tainted Hayden's subsequent removal of Wright from the LOS project. *See Hunt*, 219 F.3d at 652-53 (fact that persons making challenged employment decision, or those who provide input into the decision, express discriminatory feelings (1) around the time of and (2) in reference to the adverse employment action complained of, may provide evidence that the decision had an impermissible discriminatory motivation, since then it may be possible to infer that the decision makers were influenced by those feelings in making their decision).

The Seventh Circuit has previously stated that numerous weak proofs can add up to a strong proof: "[a] case of discrimination can…be made by assembling a number of pieces of evidence none meaningful in itself, consistent with the proposition of statistical theory that a number of observations each of which supports a proposition only weakly can, when taken as a whole, provide strong support if all point in the same direction." *Sylvester v. SOS Children Villages. Illinois, Inc.*, 453 F.3d 900, 903 (7th Cir. 2006). The Court believes that this is a quintessential example of such a case. Indeed, some of the tiles in Wright's mosaic are more clear and striking than others. But, overall, the Court is persuaded that Wright provided sufficient evidence that, viewed cumulatively, raises genuine issues as to whether Wright's race was a motivating factor in the adverse employment action.

# IV. CONCLUSION

For the reasons set forth above, the Court **GRANTS** BHEC's Motion for Summary Judgment (Dkt. 49) and **DENIES** Barth's Motion for Summary Judgment (Dkt. 52). A separate judgment of dismissal shall be entered on behalf of Defendant Brooks-Hayden Electric.

03/11/2011

SO ORDERED:

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Anne L. Cowgur
BINGHAM MCHALE LLP
acowgur@binghammchale.com,dlawyer@binghammchale.com

Christopher R. Taylor
BINGHAM MCHALE LLP
ctaylor@binghammchale.com,sjardina@binghammchale.com

Denise K. LaRue
HASKIN & LARUE
dlarue@hlllaw.com

Bradley L. Wilson
HASKIN LAUTER & LARUE
bwilson@hlllaw.com

Jeffery M. Mallamad
BINGHAM MCHALE LLP
jmallamad@binghammchale.com

Emily L. Yates
BOSE MCKINNEY & EVANS, LLP
eyates@boselaw.com,rrichey@boselaw.com,kschuster@boselaw.com

Andrew M. McNeil
BOSE MCKINNEY & EVANS, LLP
amcneil@boselaw.com,mwyatt@boselaw.com,kschuster@boselaw.com